Van's Chevrolet, Inc. v. Commissioner.
Van's Chevrolet, Inc. v. Commissioner
Docket No. 997-65.
United States Tax Court
T.C. Memo 1967-172; 1967 Tax Ct. Memo LEXIS 89; 26 T.C.M. (CCH) 809; T.C.M. (RIA) 67172; August 23, 1967
*89 Reasonable compensation of principal officer-owner of automobile dealership redetermined. Converse Murdoch and David C. Moore, 701 Bank of Delaware Bldg., Wilmington, Del., for the petitioner. Giles J. McCarthy, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax for the years 1961 and 1962 in the respective amounts of $12,516.51 and $26,113.09. The only issue is whether the compensation paid by petitioner to its president and sole stockholder, Vincent W. Vandenbraak (hereafter referred to as Vincent), in the taxable years 1961 and 1962, in the respective amounts of $49,070.21 and $75,217.47, was reasonable compensation for services rendered. Respondent determined that any amount paid to Vincent in excess of $25,000 in each year was unreasonable and therefore not deductible by petitioner. Findings of Fact Some of the facts have been stipulated [1] and are found accordingly. Petitioner is a corporation, incorporated on April 7, 1960, under laws of Delaware. Since April 1960 it has been engaged in the business of operating a Chevrolet automobile *90 dealership in New Castle, Del. Petitioner reported income on a calendar year basis and computed by the accrual method. Petitioner filed Federal corporation income tax returns for the years 1961 and 1962 with the district director of internal revenue, Wilmington, Del., at which times its principal place of business was in New Castle, Del. Petitioner's business activities encompassed all phases of the retail automobile business, including the sales and servicing of new and used automobiles and trucks, the sales and installation of automobile parts and accessories, and arranging for the financing and insuring of the vehicles sold. Vincent was born in 1919 and has always lived in or near Wilmington, Del. He graduated from high school in 1938, and his first job was working in his family's dairy. In April 1941 he entered the Army and served in the medical corps until sometime in 1945. After discharge from the Army, Vincent enrolled at the University of Delaware, which he attended for 3 1/2 years. In 1949 he went to work on a part-time basis as salesman for a Ford dealership in Wilmington, Del., during which time he attended Temple University Law School for 1 year.he later attended night *91 school for 1 1/2 years. Vincent was employed as a salesman for the Ford dealership, and reported to the owner and general manger, until it was sold in November 1952. Thereafter, Vincent worked for the new owner as a branch manager and was in charge of selling new and used cars and of arranging financing and insurance, and generally being responsible for automobile inventories. He supervised the work of all the sales personnel. His employer sold the business in 1954, and he went to work for another dealership where he was sales manager, reporting to the owner, for about 3 years. In 1957 he went to work for a local DeSoto-Plymouth dealership as general sales manager. His annual income was then about $14,000 to $14,500. In the latter part of 1959 or early 1960 Vincent left the DeSoto-Plymouth dealership in order to apply for a Chevrolet franchise formerly held by Travers Motors, Inc. (hereafter referred to as Travers). He spent 3 to 4 months in negotiations with Chevrolet Motor Division and with Motors Holding Division of General Motors Corp. (hereafter referred to generally as General Motors), after which he obtained the franchise. The Travers place of business was located at 4th and *92 Chestnut Streets in New Castle, Del. Chestnut Street was used to get to and from the New Castle ferry while it was in operation. The ferry went out of business upon completion of the Delaware Memorial Bridge. The street became vacated when the ferry went out of business, and there was little or no traffic on the street. The location was poor for an automobile dealership. For the calendar year 1958, Travers had gross sales in the amount of $900,492, an operating loss of $9,823, other income including finance income and insurance commissions, totaling $18,290, and a net profit of $62. It paid executive and supervisory salaries totaling $23,195 during 1958. For the year 1959 Travers had gross sales in the amount of $617,144, other income totaling $12,571, and a net loss of $15,226; and it paid its officers $15,809. [2] At December 31, 1958, Travers had a deficit of $1,855.28; at the end of 1959 the deficit was in the amount of $17,081.77. The Travers facilities consisted of two buildings on about 1 1/2 acres of land, one with about 3,200 square feet of space and the other with space of about 5,500-6,000 square *93 feet. In one building, built in about 1952, there was a showroom, which accommodated only one car, and a parts department. The service facility was housed in the other building which was about 30 years old. General Motors was dissatisfied with the Travers facilities, and, as a condition to obtaining a Chevrolet franchise, Vincent agreed to build new facilities for the dealership between the second and fourth years of operation. Petitioner's authorized capital stock when it was incorporated consisted of 360 shares of class A ( $100 par) voting stock and 660 shares of class B ( $100 par) nonvoting stock. The two classes of stock shared equally in dividends. Losses were to be borne equally up to 15 percent of the par values; thereafter the losses were to be borne by the class B stock up to its full par value. The class A stock was convertible to class B stock at the holder's election and was redeemable at book value at the discretion of the directors. When there was no class A stock outstanding the class B stock acquired voting privileges. In connection with granting Vincent a Chevrolet franchise, on March 30, 1960, General Motors executed an offer to loan petitioner $26,000 and to subscribe *94 to 260 shares of its class A stock for $26,000 cash. The offer contained various restrictions on petitioner's use of its earnings and directions on how they were to be used while the loan remained unsatisfied, which, in general, required petitioner to apply 45 percent of its net earnings toward payment of principal of the loan and $1 of the remaining earnings toward redemption of the class A stock for each $1.20 paid out in dividends. An amount equal to surplus or earnings used to pay principal on the loan and to redeem the class A stock was required to be transferred from earned surplus to capital surplus. This offer was accepted by petitioner. In April 1960 petitioner issued its promissory note in the amount of $26,000 to General Motors as evidence of the loan, and issued 260 shares of its class A stock to General Motors pursuant to its subscription. At the same time 300 shares of the class B stock of petitioner were issued to Vincent for $30,000 in cash. By April 1, 1961, petitioner had repaid in full the $26,000 loan from General Motors, and by April 17, 1961, all of the class A stock held by General Motors had been either redeemed by petitioner or purchased by Vincent. When Vincent *95 became the owner of all the outstanding stock of petitioner he converted all of his class B stock into class A voting stock. Since that time Vincent has owned all the outstanding stock of petitioner. Vincent has been president and chief executive officer of petitioner since its incorporation. From the date of its incorporation until May 18, 1961, petitioner's board of directors consisted of Vincent and two representatives of General Motors. Thereafter petitioner's board of directors was comprised of Vincent and two or more of petitioner's employees. On April 20, 1960, petitioner's board of directors fixed Vincent's monthly salary at $866.67; on July 29, 1960, they increased it to $1,083.33, effective August 1, 1960; and on February 28, 1961, they increased it to $1,516.66, effective March 1, 1961. Also in April of 1960 petitioner entered into a written bonus agreement [3] with Vincent whereby petitioner agreed to pay Vincent, as president, a bonus in addition to his salary equal to one-third of earnings above 15 percent per year on its average month-end capital for "an initial period" from April 20 to December 31, 1960, and for "each calendar year after the initial period." Pursuant *96 to the bonus agreement, on January 23, 1961, the board of directors determined Vincent's bonus for the initial period ending December 31, 1960, to be $15,598.33; his total compensation for this period was $23,903.33. After General Motors was "paid out" in April of 1961 there was apparently no formal change made in the salary Vincent was to receive, but there was a change in his bonus arrangements. The monthly management control records maintained for petitioner reflect that after March of 1961 and continuing through the year 1962 Vincent received a monthly salary ranging from $1,400 to $1,610 at varying times. Those records also reflect that during the above period Vincent also received a monthly bonus equal to approximately 10 percent of the monthly net profits on sales before owner's bonuses and taxes, except that in December of 1961 Vincent received a bonus of $20,000 (rather than the $1,064 the 10 percent would have given him), and in December of 1962 Vincent received a bonus of $39,000 (rather than the $1,635 the 10 percent would have given him). These yearend bonuses paid to Vincent were agreed upon by the board of directors *97 in December of each year in the light of the success of the business during that year. During the year 1961 Vincent received total compensation from petitioner in the amount of $49,070, of which approximately $17,333 represented regular monthly salary and approximately $31,737 represented regular monthly and yearend bonuses. During the year 1962 Vincent received total compensation from petitioner in the amount of $75,217, of which approximately $18,200 represented regular monthly salary and approximately $57,017 represented regular monthly and yearend bonuses. [4] Petitioner enjoyed rather phenomenal business and financial success since it began business. Its new car sales far exceeded the "planning potential" of 350 cars given it by General Motors in each of the years 1960, 1961, and 1962. By December 31, 1960, it had sold 565 new cars, or 161.4 percent of its "planning potential" for the year, and 600 used cars. During the year 1961 petitioner sold 887 new cars, or 253.4 percent of its "planning potential," and *98 1,178 used cars. During the year 1962 petitioner sold 1,034 new cars, or 295.4 percent of its "planning potential," and 1,360 used cars. These percentages far exceeded the averages of "planning potentials" achieved by the four groupings of Chevrolet dealerships in the Philadelphia zone for both of the years 1961 and 1962, based on information supplied by General Motors. Petitioner reported the following gross sales, gross profits from sales, financial and other income, and taxable income for the taxable years indicated: Gross profit
Financial &
Taxable
Year
Gross sales
from sales
other income
income [1]
1960
$1,883,152
$201,590
$48,864
$65,720
1961
3,302,655
381,115
73,997
68,310
1962
3,952,807
470,185
80,761
86,638
The ratio of Vincent's total compensation to petitioner's gross sales was 1.3 percent for 1960, 1.4 percent for 1961, and 1.9 percent for 1962. The approximate ratio of Vincent's total compensation to petitioner's net profit, before Vincent's compensation and Federal and State taxes, was 26 percent for 1960, 41 percent for 1961, and 45 percent for 1962. Based on information furnished petitioner by General Motors for the years 1961 and 1962, owner's salaries *99 and net profit (before tax) per new car sold by Chevrolet agencies in the Philadelphia zone were as follows: Selected [1]
Peti-
dealer
Single [2]
Entire
Year
tioner
guide
city
Metro [3]
zone
Salaries
1961 $19
$ 29
$ 29 $24 $26
1962
18
28
26
22
24
Net profit
1961 $77
$ 61
$ 54 $39 $46
1962
88
101
106
76
90
John Vandenbraak, Vincent's brother, was service manager and director of customer relations for petitioner, and became secretary of petitioner after Vincent obtained control. His compensation and that of other key employees was as follows: Employee
1960
1961
1962
John Vandenbraak
$4,469
$20,708
$22,465
Joseph Beden [1]
11,488
12,998
Frances A. Talmo [2]
8,277
15,508
16,340
William L. Favreau [3]
4,775
8,055
9,800
Condensed balance sheets of petitioner for the years 1960, 1961, and 1962, reflect the following: December 31, 1960
Assets
$352,445.02
Liabilities
274,599.00
Net worth
Capital stock
$ 51,200.00
Capital surplus
21,174.38
Retained earnings
5,471.64
77,846.02
352,445.02
December 31, 1961
Assets
$383,293.73
Liabilities
281,600.85
Net worth
Capital stock
$ 46,000.00
Retained earnings
55,692.88
$101,692.88
383,293.73
December 31, 1962
Assets
$404,343.23
Liabilities
255,564.07
Net worth
Capital stock
$ 46,000.00
Retained earnings
102,779.16
148,779.16
404,343.23
From *100 the date of its incorporation until the date on which Vincent became its sole stockholder, petitioner made cash distributions of dividends totaling $13,912.53; thereafter petitioner declared no further dividends. Vincent was the chief executive of petitioner and he was responsible for the growth and success of petitioner. As is often the case in a small business such as petitioner's, it was the drive, initiative, leadership, and planning of one individual, Vincent in this case, that made the operation as profitable as it was. Vincent actively participated in and made decisions with respect to all phases of petitioner's operations. In order to get petitioner started in business Vincent hired 25-30 employees, including sales and office personnel who had to be trained for their tasks. Vincent had a daily training program every morning for salesmen at a sales meeting held at 8:30 a.m. At these meetings results of the previous day's operations would be discussed and there would be prepared for each salesman an inventory list of used cars traded in the day before. Vincent priced the used cars and put them in inventory at wholesale value. In training salesmen, Vincent would cover closing *101 techniques, selling insurance and finance plans, and discuss any mistakes of the previous day. During the years 1960, 1961, and 1962, petitioner maintained a service department, a parts department, a new and used automobile department, and an administrative office for the office manager. There was no separate new car department, and salesmen were both new and used car salesmen. The new and used car managers worked closely together. The function of the service department was to service cars that were in or out of warranty, but in petitioner's case it serviced principally cars that were under warranty since the department had limited facilities and petitioner was selling more cars than it could service. About 75 percent of petitioner's service income came from Chevrolet in handling warranty customers, and this business would fill up the service facilities. Consequently, petitioner had little opportunity to earn income from "paid labor"; that is, labor on jobs other than warranty service. The parts department generally supplied the service department with parts for repairs, and also handled accessories installed on new cars. The department also sold, at wholesale, parts to garages, service *102 stations, and other dealers. Vincent engaged in selling and handling new cars in conjunction with the new and used car managers. Vincent set quota, daily grosses, and objectives. He had the sole authority to refuse or accept a deal. He also approved trade-in values, checking purchase prices put on trade-ins. He made sure that, whenever possible, petitioner could arrange for insurance and financing for new and used cars sold, and he supervised the ordering of new cars with equipment and accessories. In the service department, Vincent's biggest function was in handling service complaints. Vincent's chief activity in the parts department was to control inventory by checking monthly and bi-monthly orders to assure that they were for items which would move rapidly and not tie up working capital. During 1960-1962, petitioner generally ordered parts for its own needs rather than for resale. Vincent was very anxious for his salesmen to earn finance income which was paid to the dealer by the finance companies for getting the customer to finance his car with the particular finance company and "for handling the deal." Vincent believed that such finance income could constitute a large part of *103 petitioner's income. Vincent worked hard in obtaining this type of income, and at one time petitioner was the leading dealer in the eastern United States in sales of new units in deals where GMAC financed the purchase. Vincent personally chose finance companies and banks which had wide public appeal, and tried to make the best possible deal with them. During the years 1960-1962 petitioner was not able to advertise in the Wilmington area by billboard since General Motors set geographic locations within which a dealer could advertise and petitioner was not permitted to use billboard advertising in deference to Wilmington, Del., dealers, although the only attractive place for petitioner to advertise at the time was in Wilmington. However, petitioner in a short time obtained the consent of General Motors to employ newspaper advertising in the Wilmington area. Vincent was in charge of all advertising, including successful advertising by radio, and petitioner had no other employees for advertising purposes. Vincent had a direct participation in placing used cars. Daily, he directed inventory control of new and used cars. It was important that petitioner not have capital tied up in unsalable *104 cars. Some used cars that were traded in on new cars were in such condition that Vincent directed that they be sold immediately at wholesale since they were unfit for retail sale. Other used cars came into petitioner's dealership in such shape that they could be sold at retail after being reconditioned. Vincent ordered that all used cars held for sale at retail be sold at wholesale if not sold at retail within 20 days. Vincent negotiated with GMAC to finance petitioner's purchase of new cars by floor plan. He also participated in the sale of insurance with respect to the sales of new cars. In 1960, when petitioner was just getting started in business, Vincent worked for petitioner about 15 hours a day. In September 1960 Vincent suffered a physical collapse, and his doctors, as well as General Motors, advised him to cut his workday to 6 or 7 hours. Therefore, in 1961 and 1962 Vincent worked shorter hours than in 1960. Vincent took a week's vacation in January 1961, and a 2-week vacation in March 1963. Vincent also spent time entertaining business associates on behalf of petitioner at his home and elsewhere. During the period 1960-1962, petitioner instituted a life, health, and accident *105 program which is obtained through Delaware Automobile Dealers' Association, which had a group plan for its associates. However, petitioner had no pension, profit-sharing, or any similar programs for deferred compensation for any of its employees. In 1962, General Motors began to be persistent in its demand that petitioner fulfill its obligation to build new facilities. Vincent was constantly on the lookout for suitable land and financing for new facilities. Petitioner bought one tract of land which it later sold to buy a better tract. Vincent had to handle zoning problems, hire an architect to prepare plans for presentation to prospective mortgage lenders, and to receive bids for construction. Petitioner retained a CPA and employed a full-time comptroller and treasurer [5] who was in charge of the office and the preparation of periodic financial statements for report to Chevrolet. Vincent worked closely with the treasurer in maintaining a daily operating control, which let them know exactly how the business had done on the preceding day. The daily operating control, which is utilized by aggressive dealers, made it possible for Vincent and *106 his car sales managers to know the cash on hand, the sales, the number of new and used car sales, the work of the service department and the parts department, and the finance income, all of the previous day. The comptroller and Vincent discussed the operating budget for each following month, and Vincent took care to see that all major expenditures were provided for. Petitioner, as a Chevrolet dealership, was required to submit to General Motors a report every 10-day period. This report showed the number of sales of both new and used cars and the size of the inventory. Also, before the 10th of every month, a complete financial report for the preceding month had to be prepared and delivered to Chevrolet. In 1956 Vincent opened a liquor store in Wilmington, Del., which was owned by Blue Rock Liquors, a corporation in which Vincent was president and controlling stockholder. By 1960 the store was operated by a manager and Vincent did not have to spend much of his time in connection with this business. Vincent received compensation as president of Blue Rock Liquors in the amounts of $13,960 in 1961 and $16,470 in 1962. Ultimate Findings of Fact The compensation paid Vincent by petitioner *107 for the year 1961 was for services actually rendered and was reasonable in amount. The amount of $60,000 was reasonable compensation for the services rendered by Vincent to petitioner for the year 1962. Opinion The only issue is whether the salary and bonuses paid by petitioner to its president and sole stockholder, Vincent, during the years 1961 and 1962, in the total amounts of $49,070.21 and $75,217.47, respectively, were reasonable compensation for services actually rendered. Respondent determined that all amounts paid in excess of $25,000 each year were unreasonable and nondeductible by petitioner. Section 162 of the 1954 Code provides that there "shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including (1) a reasonable allowance for salaries or other compensation for personal services actually rendered." Section 1.162-7, Income Tax Regs., provides that "in any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances." This is a question of fact depending on the circumstances in each case, although reference may be made to compensation *108 paid to employees occupying similar positions in other comparable businesses to aid in determining the reasonableness of the compensation paid by the taxpayer involved. Respondent's determination is presumed to be correct and petitioner has the burden of proving that it was erroneous. Once the petitioner has shown by competent evidence that respondent's determination was erroneous, the presumption in favor of respondent's determination loses its force and the Court must determine from all the evidence available what was reasonable compensation for the services rendered. Courts will scrutinize with a sharp eye large amounts of compensation paid by closely held corporations to employees who own a large part, or all, of its capital stock, as here, because the compensation paid must not only be reasonable in amount [but] must also be paid for services actually rendered; and this is particularly true where the corporation has paid no dividends. It is a simple matter for the owner-employee to take the corporate profits out in the form of deductible compensation rather than nondeductible dividends. On the other hand the reasonableness of the compensation paid to an owner-employee who renders *109 valuable services should not be limited simply because the employee is also the owner and could have taken a part of the amount paid him out of the corporation in the form of dividends. Numerous criteria have been used by the courts in deciding this issue in the myriad of cases in which it has been involved and it would be of little value to repeat them here. Suffice it to say that we have given consideration to all of those factors in reaching our conclusion, some of which are mentioned herein and some of which are not. Here we have an individual who, after about 10 years' experience in the automobile dealership business, took over an unsuccessful Chevrolet franchise in a relatively poor location, and developed it into what must be considered one of the most successful Chevrolet dealerships in the Philadelphia-Wilmington area, in the short time of about 2 1/2 years. There can be little question that the phenomenal success of petitioner's business resulted from the individual efforts and abilities of Vincent, including his industry, imagination, planning and selling abilities, and primarily his promotional, managerial, and organizational abilities. There is nothing in this record that *110 would explain the almost overnight success of petitioner's enterprise except Vincent's efforts and capabilities. Under the circumstances of this case we think it is clear that the determination made by respondent was unreasonable. The compensation paid Vincent for the 8 months of 1960 after he took over the franchise amounted to about $24,000 under the General Motors controlled salary and incentive bonus plan. This bonus plan was entered into at the time petitioner took over the business and we think it is only reasonable to assume that General Motors would be concerned that the new owner did not drain off all the corporate profits in salary and bonuses, at least until it recovered its investment and petitioner had a sufficient surplus to assure its continued success. The bonus paid to Vincent for 1960 was determined under a preset formula, dependent to a large extent on the success of the venture, and not by looking at the income available at the end of the year for payment of bonuses. Yet the average monthly compensation respondent has determined to be reasonable for Vincent's services during 1961 and 1962 is less than the average monthly compensation he received for the 8 months *111 of 1960; and this was during a period when petitioner's gross sales were being increased from the $617,144 gross sales of Travers for the year 1959 to petitioner's gross sales of almost $2 million for 1960, $3 1/3 million for 1961, and almost $4 million for 1962; and also during a period when the net profit of the business before owners' salaries and taxes increased from zero in 1959 to almost $162,000 for 1962. We believe reasonable compensation for the services rendered by Vincent during the years 1961 and 1962 was in excess of the $25,000 determined by respondent. What then was reasonable? The evidence presented indicates that Vincent spent long hours working for petitioner until he had a physical collapse in the latter part of 1960, and that during 1961 and 1962 he worked more normal hours. He apparently took very little time off and was active in all phases of the business. The evidence also indicates that Vincent's efforts were primarily responsible for the success of the business. Other evidence indicates that Vincent's salary per car sold was lower than the average salaries per car sold paid to other owners of Chevrolet agencies in the Philadelphia area during both of the years *112 1961 and 1962. The evidence also indicates that petitioner's net profits per car sold were higher than the average for the area for 1961 but were about even with the average for the year 1962. These figures do not mean much without more information about the other dealerships taken into consideration in establishing these averages, but they do have some evidentiary value that Vincent's compensation was not too much out of line, because owners' compensations necessarily entered into the computations. Petitioner also offered the testimony of the executive secretary of the Delaware Automobile Dealers' Association to the effect that petitioner's progress and success exceeded considerably that of any other member of the association during this time. In addition, petitioner offered the expert testimony of Herbert Northrup, a professor of the Wharton School of Finance and Commerce, who had had considerable experience in the field of employee relations and compensation matters over a period of 20 years, who testified that in his opinion the compensation paid to Vincent for each of the years 1961 and 1962 was reasonable for the services rendered. He supported his opinion with detailed reasoning *113 based upon a thorough study of petitioner-corporation, setting forth the various factors he took into consideration in arriving at his conclusions. We have given considerable weight to the testimony of Northrup in arriving at our conclusions. However, we have also taken into consideration the fact that Northrup had little first-hand knowledge of compensation paid to other owner-employees in the retail automobile dealership business. Based on all the evidence presented and taking into consideration all of the factors that we believe should have a bearing on the issue, we have used our best judgment to conclude that the compensation paid Vincent for 1961 was for his services actually rendered and was reasonable in amount; and that reasonable compensation for the services rendered by Vincent in 1962 was $60,000. Of course, the exactitude of the latter figure can be no greater than the conclusion reached by Vincent and his board of directors in fixing his bonus at the end of the year 1962; nor than the determination of $25,000 made by respondent; nor indeed than the general conclusion reached by Northrup. In concluding that the total compensation paid Vincent for 1962 was excessive to *114 the extent of about $15,000, we have attempted to make comparisons of the compensation paid Vincent for 1960 and 1961 for services rendered in those years with the compensation paid him in 1962 for services rendered in that year. We have also given consideration to the fact that while Vincent appears to have taken monthly bonuses of about 10 percent of profit before taxes and salary during the years 1961 and 1962, there was no fixed formula used in determining Vincent's year-end bonuses for either 1961 or 1962, and in fact neither Vincent nor any other witness satisfactorily explained how the amounts were arrived at, except by looking over the profit of the business during the year. The percentage of Vincent's compensation to gross sales and net profits also increased in 1962 over the prior years, despite the fact that Vincent does not appear to have rendered any more valuable services. Of course petitioner's gross sales and net profits did increase in 1962 over 1961, and we recognize that in the marketplace for outstanding executive and managerial talent success is usually an important factor and generally demands and receives a reward, but we also recognize that the rewards received *115 by sole stockholders may at times include return on an investment as well as compensation for services actually rendered. Decision will be entered under Rule 50. Footnotes
1. Including facts stipulated orally at the trial.↩
2. There were three officers, all named Travers and presumably related to each other.↩
3. This was a printed form presumably used by General Motors.↩
4. The total compensation figures are stipulated and are accurate; the breakdown between salary and bonuses may not be absolutely accurate but is at least a close approximation.↩
1. After deduction for Vincent's compensation.↩
1. 20-21 of the best operations in the zone as chosen by Chevrolet. ↩
2. Locations where there was only 1 Chevrolet dealership in the city. ↩
3. Locations where there were several dealerships in the immediate trading area.↩
1. Used car manager. ↩
2. New car manager. ↩
3. Secretary-treasurer until May 1961; thereafter comptroller.↩
5. The treasurer-comptroller was elected in 1961.↩